UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RACHEL ENFELT,

        Plaintiff,

v.                                                                                          Case No. 18-C-604

ANDREW SAUL,
Commissioner of Social Security,

        Defendant.

**DECISION AND ORDER**

Plaintiff Rachel Enfelt commenced this civil action for judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act. Enfelt contends that the administrative law judge's (ALJ's) decision, which became final after the Appeals Council denied review, R. 1–6, is subject to reversal on five grounds. These grounds include: (1) the ALJ's listing discussion failed to comport with the Act; (2) the ALJ erroneously relied on Enfelt's activities of daily living; (3) the ALJ failed to include a function-by-function residual functional capacity (RFC) assessment; (4) the ALJ erroneously relied on the vocational expert's (VE's) testimony; and (5) the ALJ failed to account for Enfelt's moderate limitations in concentration, persistence, or pace (CPP) in the RFC assessment. For the reasons provided below, the Commissioner's decision will be affirmed.

**BACKGROUND**

Enfelt filed an application for SSI on February 25, 2014, alleging disability beginning on November 13, 2013. After her claim was denied both initially and upon reconsideration, Enfelt filed a written request for a hearing before an ALJ. ALJ Guila Parker conducted a video hearing

on February 1, 2017, at which Enfelt, who was represented by counsel, and a VE testified. R. 34–63. At the time of the hearing, Enfelt was thirty-seven years old and lived in a duplex with her teenage daughter. R. 39–40. Enfelt's mother and three of her sons, one eighteen and the others twelve-year-old twins, would regularly visit her, though they did not stay with her full-time. R. 40–41.

At the hearing, Enfelt testified about her employment after November 13, 2013, the date she allegedly became disabled. R. 41. Enfelt testified that she worked at Woodlands Senior Park, an assisted living facility in Fond du Lac, Wisconsin, where she helped set up tables, pour drinks, and put food on plates, a position she left after two to three weeks because she found it too difficult to work independently. R. 42. When asked about her employment at Opportunities, Inc. and Wisco Partners, she testified that she does not remember those jobs, although she speculated they may be related to job coaching through "DVR." R. 41–43. Enfelt also testified that she tried pet grooming and factory work but stopped because she could not handle the pace or remember the tasks that needed to be performed. R. 49–52.

When asked to identify her biggest struggle with full-time work, Enfelt testified that her learning disability makes it difficult for her to concentrate, work at a fast pace, and remember things. R. 43. She testified that she struggled with reading, writing, and dealing with money. *Id.* She also testified that she suffers from anxiety, which is triggered when she is on her own and does not know what to do and the symptoms of which include panicking, becoming shaky and "flushy," and leading her to walk away. R. 43–44. She also claimed to suffer a bit of depression because her disability prevents her from doing things, such as adequately caring for her children. R. 44.

Describing her leisure activities, Enfelt testified that she and her teenage daughter watch movies at home, take care of their dog, and go shopping at the grocery store and mall. R. 45. Enfelt

2

also watches movies at her place with a couple friends. R. 46. Enfelt testified that she sometimes goes out to eat with her parents and that she attends family gatherings. *Id.* Regarding household chores, Enfelt testified that she receives help from her mother in paying bills, but she is able to manage her personal care, make frozen T.V. dinners, share laundry responsibilities with her daughter, and change her bed sheets regularly. R. 47–48. When driving, Enfelt sticks to familiar roads within city limits and maintains reasonable speeds because she will panic if moving too quickly. R. 54.

In a thirteen-page written decision dated April 10, 2017, the ALJ concluded that Enfelt was not disabled within the meaning of the Social Security Act since February 25, 2014, the application date. R. 15, 27. The ALJ applied the Social Security Administration's (SSA's) five-step sequential evaluation process. At step one, the ALJ determined that Enfelt had not engaged in substantial gainful activity since February 25, 2014. R. 17. At step two, the ALJ found that Enfelt had the following severe impairments: cognitive disorder, adjustment disorder, and a learning disability. *Id.* At step three, the ALJ determined that Enfelt did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 18. After reviewing the record, the ALJ concluded that Enfelt had the RFC to

> perform a full range of work at all exertional levels, but is restricted to never working around dangerous moving machinery. The claimant is also limited to simple, routine, and repetitive tasks performed in a low stress job (defined as one that requires no more than occasional work-related decisions and changes in the work setting), in a position that requires no more than occasional interaction with the public, with no production rate pace (such as assembly line work) or job tasks that require a GED Mathematical Development higher than 01 as defined in the DOT. Furthermore, the claimant would require that instructions be repeated at least

twice daily (or tasks be demonstrated at least twice daily) and her work checked at least once daily during the first week of employment.

R. 21. At step four, the ALJ noted that Enfelt had no past relevant work. R. 26. However, the ALJ determined at step five that there exist jobs in the national economy in significant numbers that Enfelt could perform, such as commercial cleaner (janitor), hospital cleaner, or laundry laborer. R. 26–27. After the ALJ's decision that Enfelt was not disabled within the meaning of the Social Security Act became final, Enfelt filed this action for judicial review.

## LEGAL STANDARD

The question before the court is not whether it agrees with the Commissioner's conclusion that the plaintiff is not disabled. Judicial review of the decisions of administrative agencies is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Supreme Court recently reaffirmed that "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Beistek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

"Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Step Three Listing Discussion

Enfelt first challenges the ALJ's determination that she does not meet the requirements of listing 12.05B (Intellectual Disorder). Under the SSA's regulations, a claimant is presumed disabled if he or she has an impairment that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, Subpart P, App'x 1. Each listing specifies the criteria for impairments that are considered presumptively disabling. 20 C.F.R. § 404.1525(a). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citations omitted).

Enfelt contends that the ALJ's discussion of listing 12.05B failed to comport with the SSA's requirements. To satisfy Paragraph B of listing 12.05, a claimant must satisfy 1, 2, and 3:

> 1. Significantly subaverage general intellectual functioning evidenced by a or b:
>     (a) a full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>     (b) a full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
> 2. significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>     (a) understand, remember, or apply information (see 12.00E1); or
>     (b) interact with others (see 12.00E2); or
>     (c) concentrate, persist, or maintain pace (see 12.00E3); or
>     (d) adapt or manage onself (see 12.00E4); and
> 3. the evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05B. Enfelt argues that the ALJ's analysis amounts to "plain legal error." Dkt. No. 12 at 17. In her brief, Enfelt notes that the ALJ ignored Enfelt's full-scale IQ score of 61 in the listing discussion, despite mentioning it elsewhere in the decision. *See* R. 22. She also argues that the record is replete with examples of her marked to extreme limitations in adaptive functioning and that the ALJ mischaracterized and inappropriately cherry-picked evidence in deciding that the listing was not met.

As an initial matter, the ALJ's omission of Enfelt's IQ in the listing discussion is insignificant because Paragraph B requires that each of its subparts be met. The ALJ's determination that Enfelt failed to meet subpart 2 therefore obviates the need to analyze the other subparts. Given that the ALJ analyzed in detail each prong of subpart 2, the listing discussion can hardly be said to be "perfunctory" such that judicial review ceases to be meaningful. *See Barnett v. Barnhart*, 381

6

F.3d 664, 668 (7th Cir. 2004); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). As to the evidence Enfelt cites in support of her argument that the listing is met, the ALJ addressed that evidence but nevertheless determined in light of the whole record that Enfelt's limitations did not equal the "severity" required to meet the listing. R. 18. In doing so, the ALJ offered more than a "mere scintilla of evidence" to support her findings.

In considering Enfelt's ability to understand, remember, and apply information, the ALJ acknowledged Enfelt's self-reports as well as the opinions of her husband, DVR counselor, and job coach. *Id.* The ALJ noted Enfelt's poor memory; her need for help when reading written instructions and need for one-on-one coaching when following spoken instructions; her difficulty initiating things, asking simple questions, learning things, and requesting assistance; her Working Memory score of 69 on a standardized test; and her limited math, writing, and spelling abilities. *Id.* However, the ALJ also noted that multiple examinations evidenced Enfelt's intact immediate, short-term, and remote memory; that she was able to follow a three-step command during a consultative examination; that she performed her work at TJ Maxx satisfactorily, choosing to quit due to childcare rather than performance issues; and her self-reported ability to perform various activities of personal care and daily living. *Id.* Based on this evidence, the ALJ determined that Enfelt's limitations in this area were at most moderate.

In the area of interacting with others, the ALJ noted that Enfelt would get upset, lash out at others, and experience panic attacks that caused her to leave work situations. *Id.* The ALJ also noted the opinions of Enfelt's DVR counselor and job coach, who said that she has trouble asking simple questions, requesting assistance, and handling conflict, needs regular reassurance, and can easily have her mind changed. *Id.* But the ALJ also noted that examination notes described Enfelt

as pleasant, cooperative, upbeat, and socially engaging with normal speech. *Id.* The ALJ also remarked that Enfelt admitted to having friends and getting along with authority figures and that Enfelt was married twice with active participation in a new relationship. R. 18–19. Again, the ALJ determined that Enfelt's limitations in this area were at most moderate.

Regarding CPP, the ALJ noted Enfelt's testimony that she has difficulty with fast pace work, a consultative examination during which she demonstrated concentration difficulties, her Processing Speed Index score of 71, and her ex-husband's report that she has no problem-solving skills and will avoid activities. R. 19. The ALJ also considered that Enfelt displayed good effort and persistence during standardized testing; was able to follow a three-step command without error during a consultative examination; reported that she finishes what she starts; she engaged in a number of daily living tasks that show her ability to concentrate, persist, and maintain pace; she performed her job successfully at TJ Maxx; and she followed along at the hearing with no apparent deficits. *Id.* This evidence led the ALJ to determine that Enfelt's limitations in CPP were no more than moderate.

Lastly, in the area of adapting or managing onself, the ALJ noted Enfelt's self-reported difficulty adapting to change and her ex-husband's reports that she has no problem-solving skills if a task changes. *Id.* The ALJ also noted that Enfelt navigated several temporary and part-time jobs, choosing to leave them to care for her children; has engaged in multiple relationships; manages her personal care; and tends to her children's needs when she is caring for them. *Id.* From this evidence, the ALJ concluded that Enfelt had no more than moderate limitations in this area. Together, this evidence led the ALJ to conclude that Enfelt's mental impairments did not cause at least two marked limitations or one extreme limitation, making Paragraph B inapplicable. *Id.*

Enfelt identifies several errors with this analysis. She first argues that the ALJ mischaracterized her ability to follow a "three-step command" during an examination, as the psychologist's report actually stated that "[s]he could follow all three commands quickly, appropriately and in sequence." R. 340. But Enfelt calls the ALJ's characterization "prejudicial" without explaining how it is prejudicial. Reply Br., Dkt. No. 23, at 3. While following three commands quickly and in sequence is different than following a three-step command, the former nevertheless demonstrates a basic ability to "follow[] one- or two-step oral instructions to carry out a task," for example, and to focus and stay on task, which are considerations the ALJ must take into account when assessing the relevant areas of adaptive functioning. *See* 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00E. This distinction is therefore inconsequential.

Next, Enfelt argues that the ALJ ignored the difficulties she experienced at TJ Maxx. Enfelt cites a disability report in which she describes a time when she felt overwhelmed at TJ Maxx while working fitting rooms. R. 274. Enfelt had difficultly keeping track of clothing and which racks to use for unwanted clothes, but that was after "someone showed [her] for one shift what [she] needed to do." *Id.* In contrast, she describes her work hanging and tagging clothing at TJ Maxx as "comfortable" after she "had assistance for a week learning the job" and where others were available to answer her questions. *Id.* Despite not explicitly mentioning Enfelt's fitting room experience, the ALJ noted that TJ Maxx considered her work satisfactory and contemplated extending her an offer. R. 18–19. An inability to immediately learn and carry out new tasks after a single shift may demonstrate some limitations in adaptive functioning, but Enfelt's overall success on the job, among other evidence, led the ALJ to conclude that she was no more than moderately limited in the areas of understanding, remembering, or applying information and CPP. This conclusion is supported by substantial evidence.

Lastly, Enfelt argues that the ALJ erroneously relied on evidence of her daily activities in the listing discussion. Enfelt correctly notes that an ALJ must be careful not to equate the ability to engage in some activities with an ability to work full-time. *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014). But the ALJ may consider daily activities in evaluating the intensity and persistence of symptoms and the extent to which symptoms limit one's ability to work. *See* 20 C.F.R. § 416.929(c). The ALJ cited Enfelt's testimony and the report of psychologist Dr. Robert Schedgick regarding Enfelt's daily activities in support of a finding that Enfelt was not more than moderately limited in the areas of understanding, remembering, or applying information and CPP. R. 18–19. This evidence was cited on the heels of citations to Enfelt's testimony claiming limitation in these areas of adaptive functioning and was therefore used to assess the severity of Enfelt's symptoms. The ALJ may appropriately consider these activities in this context, *see* § 416.929(c); *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016), and in any event, the activities were but some of the evidence relied upon to reach conclusions as to adaptive functioning. The court is satisfied that the ALJ constructed a logical bridge between the evidence and conclusions in the listing discussion.

**B. Reliance on Activities of Daily Living**

In addition to her criticism of the ALJ's reliance on daily activities in the listing discussion, Enfelt argues more broadly that the ALJ impermissibly relied on and mischaracterized evidence of her daily activities in determining her ability to sustain competitive full-time employment. Dkt. No. 12 at 20. The Seventh Circuit has "repeatedly warned against equating the activities of daily living with those of a full-time job." *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015) (citations omitted). After citing this standard, Enfelt declares in a conclusory, single sentence that the ALJ erroneously relied on her daily activities to find her not disabled and mischaracterized her activities to find her

able to sustain employment, have moderate limitations in CPP, adapt and manage oneself, and perform simple, routine, and repetitive tasks. Dkt. No. 12 at 21. But Enfelt has failed to develop these arguments in any meaningful way and has therefore waived them. *See United States v. Adams*, 625 F.3d 371, 378 (7th Cir. 2010); *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009).

Enfelt argues next that the ALJ ignored substantial evidence of her difficulties in performing daily activities, such as the fact that her husband and mother help her pay bills, measure and read recipes when cooking, read merchandise at stores, and help her kids with homework. R. 44, 47, 207–08, 210, 223, 225, 237, 238, 344. While Enfelt is correct that the ALJ did not expressly list each of the activities with which she needs help, the ALJ acknowledged that she has a poor memory, needs help reading written instructions, and has limited academic and problem-solving abilities. R. 18–19. The ALJ therefore considered in substance if not in form Enfelt's limitations with daily activities. Moreover, far from blatantly ignoring Enfelt's difficulties, the ALJ carefully considered her testimony in light of the statements she provided to Dr. Schedgick, *see* R. 344, concluding based on Dr. Schedgick's report that Enfelt is "capable of a relatively high level of daily functioning . . . which again suggests better functioning than her assertion of disability and testimony would indicate." R. 23–24; 20 C.F.R. § 416.929(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . ."). Implicit in this conclusion is the ALJ's consideration of Enfelt's testimony as to the difficulties she experiences.

Contrary to Enfelt's suggestion, the ALJ did not equate Enfelt's ability to perform daily activities with an ability to sustain employment. Rather, the ALJ determined that Enfelt's track record of never being fired and her successful performance at TJ Maxx suggested that she remained

11

capable of work with certain limitations. R. 23–24. Only when assessing the severity of Enfelt's symptoms did the ALJ reference Enfelt's daily activities, as permitted under § 416.929(c). Enfelt's concern is therefore abated. Further, the ALJ's RFC assessment relied in large part on the opinions of state agency mental health consultants Drs. Roger Rattan and Russell Phillips, who opined that Enfelt had no more than mild to moderate limitations and remained capable of performing simple (i.e. two- to three-step) tasks in a position with a consistent routine and schedule that avoids hazards. R. 24, 74–76, 89–91. The ALJ also relied in part on the opinion of Dr. Schedgick, who opined that Enfelt, among other things, can understand, remember, and carry out basic, routine types of instructions with a regular, routine schedule, likely reacts nicely to supervisors, coworkers, and peers, and can adequately focus and concentrate over a 40-hour week (though with coaching and assistance). R. 347–49. Even notwithstanding Enfelt's daily activities, these opinions and the other evidence upon which the ALJ relies, including Enfelt's performance at TJ Maxx, constitute substantial evidence supporting the RFC.

**C. Function-by-Function RFC Assessment**

Enfelt argues that the ALJ erred in failing to perform a function-by-function RFC assessment and to address each of the seven strength demands—sitting, standing, walking, lifting, carrying, pushing, and pulling—separately, as required under Social Security Ruling (SSR) 96–8p. Enfelt also argues that the ALJ's finding that she may "perform a full range of work at all exertional levels" is inadequate under SSR 96–8p. The instruction in SSR 96–8p to perform a function-by-function assessment is meant to "ensure[ ] that the ALJ does not overlook an important restriction and thereby incorrectly classify the individual's capacity for work." *Zatz v. Astrue*, 346 F. App'x 107, 111 (7th Cir. 2009) (citing SSR 96–8p). To that end, "an ALJ need not provide a superfluous analysis of

irrelevant limitations or relevant limitations about which there is no conflicting medical evidence." *Id.* (citations omitted).

As an initial matter, Enfelt's claim of error is merely technical and conclusory, and she cites no evidence in the record showing limitations in her ability to sit, stand, walk, lift, carry, push, or pull. Dkt. No. 12 at 22. As before, such an undeveloped argument must be rejected. *See Adams*, 625 F.3d at 378; *Elst*, 579 F.3d at 747. Even were the argument developed, the ALJ's analysis is sufficient. For one thing, any discussion of Enfelt's purported physical impairments would have been superfluous and irrelevant, as Enfelt, even with assistance of counsel, failed to adequately place those impairments at issue. *See Zatz*, 346 F. App'x at 111. Indeed, not once during the February 1, 2017 hearing, even upon questioning by counsel, did Enfelt discuss her physical impairments or how they affected the seven strength demands in SSR 96–8p. R. 34–63. Even so, the ALJ considered Enfelt's physical impairments and determined, in light of the overall record and the opinions of state agency medical consultants Drs. Khorshidi and Walcott, that Enfelt's physical impairments were non-severe. R. 17, 22. This discussion is sufficient. *See Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) (citations omitted).

### D. Reliability of Vocational Expert's Testimony

Enfelt next argues that the ALJ erred in relying on the VE's testimony because the VE provided national job numbers rather than numbers for Fond du Lac, Wisconsin, where Enfelt resides. Enfelt claims that, given her impairments, she is incapable of seeking work outside of Fond du Lac, making the ALJ's reliance on the VE's national job numbers erroneous. Enfelt contends that this principle is underscored in *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014), in which the Seventh Circuit declared that "the vocational expert is required to estimate the number of jobs the

claimant can do that exist in the local, regional, and national economy" and that a claimant's immobility as a consequence of disability "needs to be factored into the analysis of job availability." *Id.* at 708. This argument fails for two reasons.

First, the plain language of 20 C.F.R. § 404.1566 provides: "We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether (1) Work exists in the immediate area in which you live . . . ." The regulation goes on to say: "[I]f work that you can do does exist in the national economy, we will determine that you are not disabled. . . . We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of— (1) Your inability to get work; (2) Lack of work in your local area . . . ." 20 C.F.R. § 404.1566(b), (c). This regulation makes clear that a claimant who can do work that exists in the national economy will not be considered disabled; work exists in the national economy if a significant number of jobs that the claimant can perform exists *either* in the claimant's region *or* in several other regions of the country; whether work exists in the claimant's immediate area is irrelevant; and whether the claimant is deemed disabled is unaffected by the claimant's inability to get work or the lack of work in the claimant's local area. The ALJ was justified in following this regulation and relying on the VE's testimony as to jobs that existed in the national economy. *Cf. Biestek*, 139 U.S. at 1152 (declaring that "the ALJ needed to ascertain whether those kinds of jobs exist[ed] in significant numbers in the national economy" and citing § 404.1566, among other statutes, in support (internal quotation marks omitted)).

Second, and relatedly, the ALJ was entitled to rely on the VE's testimony because neither Enfelt nor her attorney objected to the testimony or asked the VE about whether the job numbers provided reflected those in Enfelt's region (Wisconsin) or immediate area (Fond du Lac) despite having an opportunity to do so. The Seventh Circuit has held, post-*Browning*, that failure to object to a VE's testimony when provided an opportunity to do so forfeits arguments as to the testimony's reliability. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016); *see also Collins v. Berryhill*, 743 F. App'x 21, 26 (7th Cir. 2018); *Shaibi v. Berryhill*, 883 F.3d 1102, 1108–09 (9th Cir. 2017); *Timi W. v. Berryhill*, No. 17-1366, 2019 WL 1234344, at *10 (C.D. Ill. Feb. 20, 2019). Enfelt's challenge to the reliability of the VE's testimony accordingly fails. The purpose of allowing the claimant to raise objections and to cross-examine the VE is to allow for basic corrections or clarifications to be made to the VE's testimony before the ALJ issues a decision. Allowing claimants to withhold without penalty issues that could be easily resolved during the administrative hearing and which the ALJ could address in the first instance makes little sense and only encourages lengthy and costly appeals.

Given the ALJ's duty to comply with the SSA's regulations and Enfelt's forfeiture, the court need not address whether the language in *Browning* upon which Enfelt relies is dicta, as some courts have held. *See, e.g.*, *Kohlhaas v. Berryhill*, No. 17-CV-413-JPG-CJP, 2018 WL 1090311, at *4 (S.D. Ill. Feb. 28, 2018) ("[T]he discussion of the VE testimony and Dictionary of Occupational Titles in [*Browning* and *Herrmann v. Colvin*, 772 F.3d 1110 (7th Cir. 2014)] was dicta."); *see also Timi W.*, 2019 WL 1234344, at *9 (collecting cases). Nor must the court entertain Enfelt's objection to the VE's decision to "erode the numbers [of janitor jobs] by a factor of 80%" to account for the

15

fact that some janitor jobs may require use of moving machinery. R. 57. This argument, too, is forfeited for failure to object to the VE's methodology at the administrative hearing. *See Brown*, 845 F.3d at 254; *Timi W.*, 2019 WL 1234344, at *10 (collecting cases); *Stojanovic v. Berryhill*, No. 16-CV-1292, 2018 WL 1409838, at *4 (E.D. Wis. Mar. 20, 2018). Enfelt argues that, waiver aside, the ALJ had the obligation to clarify the VE's methodology, but even were Enfelt correct, such an error is harmless and does not warrant reversal given the VE's testimony that Enfelt may work as a hospital cleaner and laundry laborer, with 220,000 and 58,000 jobs available, respectively, in the national economy. R. 27; *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) ("[W]e will not remand a case for further specification when we are convinced that the ALJ will reach the same result."); *Lee v. Sullivan*, 988 F.3d 789, 794 (7th Cir. 1993).

**E. Incorporation of Moderate Limitations in CPP in RFC Assessment**

Enfelt's final argument is that the ALJ erred in failing to include a time off task limitation in the RFC assessment given her moderate limitations in CPP. According to Enfelt, if moderate limitations in CPP are found, as was the case here, R. 19, "then the decision must contain a [sic] off task limitation." Dkt. No. 12 at 25. In support, Enfelt relies on *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), and *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009). But neither of those cases requires that a specific time off task limitation be given where moderate limitations in CPP are found. Instead, they emphasize the more general principle that limiting an individual in a hypothetical question posed to a VE to simple, routine, and repetitive tasks fails, in most cases, to adequately account for moderate limitations in CPP. *O'Connor-Spinner*, 627 F.3d at 620; *Stewart*, 561 F.3d at 685. Enfelt's argument that a time off task limitation was required must therefore be rejected.

Enfelt's failure to develop this argument in any meaningful way is also grounds to reject it. While Enfelt focuses on the absence of a time off task limitation, she fails to cite to any evidence in the record demonstrating her moderate difficulties with remaining on task. The court need not consider such fleeting, undeveloped arguments. *See Adams*, 625 F.3d at 378; *Elst*, 579 F.3d at 747. Additionally, what Enfelt ignores is that the ALJ included in the RFC a limitation to "no production rate pace (such as assembly line work)" to address her trouble with fast pace work. R. 19, 21–23. Enfelt's trouble with fast pace work, rather than a supposed inability to stay on task, was the primary reason cited for her inability to successfully perform certain past jobs. R. 43, 49, 51. Enfelt cites to no evidence warranting a limitation relating to time off task or to evidence of limitations other than no fast pace work that were not adequately accounted for in the RFC assessment. The ALJ's assessment must therefore stand.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this   23rd   day of September, 2019.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court